**GENEVA JPM 2003–PM1, LLC, Appellant,**

v.

**GENEVA FSCX I, LLC, et al., Defendants,**

**The Geneva Organization, Inc., et al., Respondents.**

No. A13–0718.

Court of Appeals of Minnesota.

March 3, 2014.

Kevin J. Dunlevy, Michael E. Kreun, Beisel & Dunlevy, P.A., Minneapolis, MN, for appellant.

Marc Simpson, Sharon Markowitz, Stinson, Leonard, Street, LLP, Minneapolis, MN, for respondents.

Considered and decided by HOOTEN, Presiding Judge; HUDSON, Judge; and MINGE, Judge.*

## OPINION

HOOTEN, Judge.

This appeal concerns the meaning of the term "debt" as defined in a guaranty and associated loan documents. Appellant-creditor challenges the district court's interpretation of a guaranty providing that respondents-guarantors are liable for "Ten Percent (10%) of the Debt under the Loan Documents." Appellant foreclosed by action on certain real property and contends that respondents are liable under the guaranty for ten percent of the foreclosure judgments. Therefore, appellant argues, the district court erred by interpreting the guaranty to mean that respondents are liable for ten percent of the deficiency judgment—the amount remaining after the proceeds of the foreclosure sale are applied against the foreclosure judgments. Because the loan documents provide that proceeds from a foreclosure sale are applied to the debt, and because appellant foreclosed prior to collecting on the guaranty, we affirm.

## FACTS

On May 2, 2003, four companies owned by Robert Fields each executed a promissory note for a nonrecourse loan to Merrill Lynch Mortgage Lending, Inc. The four

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

Minn. Const. art. VI, § 10.

promissory notes totaled $14.4 million. Midland Loan Servicing serviced the loans. Each loan was secured by a first and second mortgage on a parcel of commercial property in Hennepin County. The four secured properties are known as the Five Star Commerce Property, Five Star Industrial Property, Bell Tower Office Property, and Bell Tower Commerce Property. The notes were also supported by four substantively similar indemnity agreements. In those agreements, Fields personally guaranteed payment of the notes and agreed to indemnify the noteholder against liabilities of the borrower for certain events, commonly referred to as "bad boy carve-outs." [1]

That same day, Merrill Lynch assigned the notes, mortgages, and indemnity agreements to Wells Fargo Bank Minnesota, N.A., as trustee for registered holders of JP Morgan Chase Commercial Mortgage Securities Corporation, Commercial Pass–Through Certificates, Series 2003–PM1 (together, Wells Fargo). A year later, Fields sold the properties (without first notifying Wells Fargo) to respondents Duane Lund and his real estate investment company, The Geneva Organization. Respondents then transferred interests in the properties to several tenant-in-common investors.

In March 2006, Midland noticed that the names of the property owners did not match those listed on the loans and that it did not have an assumption agreement on file. After some negotiation,[2] Lund, The Geneva Organization, and the tenant-in-common investors entered into four substantively similar consent and assumption agreements. Those agreements amended the indemnity agreement entered into by Fields by adding the following: "Notwithstanding the foregoing or anything to the contrary herein, Guarantor shall be liable (on a full recourse basis) to Lender for Ten Percent (10%) of the Debt under the Loan Documents." The consent and assumption agreements were recorded in Hennepin County in October 2008.

Respondents defaulted on the loans in 2010 and Wells Fargo instituted foreclosure-by-action proceedings. In May 2011, the district court filed an order for partial summary judgment that permitted foreclosure but lacked certain details to allow the foreclosures to proceed. Wells Fargo moved for a supplemental order that included those details and that "Defendants Geneva and Lund are liable for 10% of the gross debt in default." The district court filed a supplemental order that included the requested details relating to the foreclosure, but denied the request to impose liability based on the guaranty. The district court explained that:

> The issue of the value of [respondents] Lund and Geneva Organization's 10% guaranty is beyond the scope of a supplemental order in this case.... The contract language is open to multiple

---

1. The triggering events for liability under these "bad boy carve-outs" included the misapplication or misappropriation of insurance proceeds or condemnation awards in connection with the properties; the misapplication or misappropriation of rents, security deposits, or other refundable deposits; receiving rent or payments under leases more than one month in advance; the commission of waste, arson, or damage to the properties as a result of intentional misconduct or gross negligence; the removal of equipment or property in violation of the loan documents; the commission of fraud or material misrepresentation of the loan or ownership, use, operation, or management of the properties; and the transference or the encumbrance of the properties in violation of the loan documents.

2. During the negotiations, Midland was informed that Fields was "believed to be insolvent" due to a $14.6 million judgment against him.

interpretations and there are genuine issues of material fact as to what the value of a judgment against those defendants should be.

The district court also calculated the foreclosure judgment on each property. The foreclosure judgments totaled $2,351,288.71 for Five Star Commerce, $5,295,914.55 for Five Star Industrial, $4,791,287.32 for Bell Tower Office, and $2,421,204.45 for Bell Tower Commerce.

On January 5, 2012, Wells Fargo assigned the mortgages, indemnity agreements, consent and assumption agreements, and foreclosure judgments to appellant Geneva JPM 2003–PM1, LLC. Appellant was later substituted as plaintiff for Wells Fargo in the district court proceeding.

Appellant purchased the properties at a sheriff's sale on January 10. The sales were confirmed by the district court on January 25, and the district court filed an order partially satisfying the foreclosure judgments on March 16. After adding the proceeds from the foreclosure sales and other cash received during the appointment of a receivership for the properties, a surplus resulted on two of the properties— Five Star Industrial and Bell Tower Commerce. Deficiencies remained on the other two properties—Five Star Commerce and Bell Tower Office.

Appellant then filed this action, seeking to enforce the guaranty on the properties with deficiency judgments. The parties proceeded to trial in order to determine the meaning of the ten percent guaranty contained in the consent and assumption agreements. Appellant contended that respondents owed ten percent of the debt at the time of the foreclosure judgments plus other adjustments, resulting in their total liability of $792,344.53.

Without referencing the testimony or evidence elicited at trial, the district court concluded that respondents are "liable under the Indemnity Agreement pursuant to the Consent and Assumption Agreement to pay 10% of the outstanding Debt on the properties." The district court added that "[t]here is no contractual provision that disallows application of the foreclosure proceeds" and applied the foreclosure proceeds to the foreclosure judgments to determine respondents' liability on the guaranty. The district court determined $2,170,402.92 to be the total deficiency for Five Star Commerce and Bell Tower Office. Ten percent of that figure resulted in a $217,040.29 judgment. This appeal follows.

## ISSUE

Did the district court err in its interpretation of the guaranty, concluding that the foreclosure proceeds apply to the foreclosure judgments for purposes of calculating respondents' liability?

## ANALYSIS

A guaranty is "a collateral contract to answer for the payment of a debt or the performance of a duty in case of the default of another who is primarily liable to pay or perform the same." *Charmoll Fashions, Inc. v. Otto*, 311 Minn. 213, 216, 248 N.W.2d 717, 719 (1976) (quotations omitted). A guaranty is construed in the same way as any other contract. *Am. Tobacco Co. v. Chalfen*, 260 Minn. 79, 81, 108 N.W.2d 702, 704 (1961). "The construction and effect of a contract . . . is a question of law unless the contract is ambiguous." *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346 (Minn.2003).

"[T]he goal of contract interpretation is to ascertain and enforce the intent of the parties." *RAM Mut. Ins. Co. v. Rohde*, 820 N.W.2d 1, 14 (Minn.2012) (quotation omitted). "Whether a contract is

ambiguous is a legal determination in the first instance." *Blattner v. Forster,* 322 N.W.2d 319, 321 (Minn.1982). "The language of a contract is ambiguous if it is susceptible to two or more reasonable interpretations." *Dykes v. Sukup Mfg. Co.,* 781 N.W.2d 578, 582 (Minn.2010). "If a contract is unambiguous, the contract language must be given its plain and ordinary meaning, and shall be enforced by courts even if the result is harsh." *Denelsbeck,* 666 N.W.2d at 346–47.

Both parties assert that the guaranty contained in the consent and assumption agreements is unambiguous. Appellant argues that the guaranty means that respondents "are liable, on a full recourse basis, for 10% of the entire Debt, as that term is defined in the loan documents and reflected in the Foreclosure Judgments." Appellant insists that " 'Debt' includes all principal, interest, and other sums due under the notes" and that "[t]he amount of the Debt was adjudicated by the district court in ordering the Foreclosure Judgments." According to appellant, nothing in the loan documents defines "debt" to mean only ten percent of the deficiency judgment after foreclosure. Respondents argue that "the Loan Documents unambiguously state ... that the proceeds of a foreclosure apply to the Debt and that [their] liability is limited to 10% of the *remaining* Debt."

Resolution of this appeal requires us to determine the meaning of "debt" and whether that definition includes the amount due and owing before or after a foreclosure sale. The guaranty within the consent and assumption agreements states, "Notwithstanding the foregoing or anything to the contrary herein, Guarantor shall be liable (on a full recourse basis) to Lender for Ten Percent (10%) of the Debt under the Loan Documents." The consent and assumption agreements do not define "Loan Documents." But the term is defined in the mortgages as "all documents, instruments, certifications and agreements now or hereafter given in connection with, evidencing, securing or relating to the Loan or the indebtedness evidenced by the Note, including, without limitation, all indemnities, guaranties, the Note, [and] this Mortgage." Thus, when determining the meaning of "debt," we will consult these loan documents.

Debt is defined in the mortgages as:

(i) the payment of all principal, interest and other sums due under that certain promissory note dated the date hereof, made by Borrower in favor of Lender in the original principal amount ... (*"Note"*); and (ii) the payment and performance of all other covenants, obligations, liabilities or sums due or to become due under this Mortgage, the Note or any other Loan Document, including, without limitation, interest on said obligations, liabilities or sums now due or to become due under this Mortgage, the Note or any other Loan Document; and (iii) any further or subsequent advances made by Lender pursuant to this Mortgage, the Note or any other Loan Document to protect or preserve the Property or the lien or security created hereby, including all advances and costs incurred by Lender to perform any obligation of Borrower under the Loan Documents and (iv) all costs of collection in connection with this Mortgage and the other Loan Documents....

And the mortgages instruct that proceeds from a foreclosure sale are to be disbursed:

First: To the payment of the third-party costs and expenses reasonably incurred in connection with any such sale ...;

*Second:* To the payment of the whole amount then due, owing, and unpaid upon the Note for principal and interest . . .;

*Third:* To the payment of *any other Debt* required to be paid by Borrower pursuant to any provision of this Mortgage, the Note, or any of the other Loan Documents; and

*Fourth:* The surplus, if any, to the Borrower unless otherwise required by Legal Requirements.

(Emphases added.) The second clause requires foreclosure proceeds to be applied to "the payment of the whole amount then due, owing, and unpaid upon the Note for principal and interest." As noted, "debt" is defined to include "all principal, interest and other sums due under [the note.]" Therefore, the mortgages require the foreclosure proceeds to be applied to the debt. This reading is bolstered by the third clause, which refers to "any *other* Debt required to be paid by Borrower." (Emphasis added.) *See also The Compact Oxford English Dictionary* 1231 (2d ed.1991) (defining "other" as "[t]hat one of two which remains after one is taken, defined, or specified; the remaining (person, thing, or group) of two; later, also, of three or more").

Section 1 of the indemnification agreement further illustrates that foreclosure proceeds are applied to the debt: "If the *obligations guaranteed* hereby are partially paid or discharged by reason of the exercise of any of the remedies available to Lender, [Guarantors] shall remain liable for *remaining obligations* guaranteed hereby . . . ." (Emphasis added.) In this case, "the obligation[ ] guaranteed" is payment of ten percent of the debt. If payment of the debt is partially satisfied by another remedy, then respondents are still liable for ten percent of what remains. In other words, a partial satisfaction of the debt does not extinguish respondents' obligations under the guaranty. Instead, respondents remain liable for ten percent of the debt after applying the proceeds from the foreclosure sale.

This interpretation is consistent with caselaw examining the effect of a foreclosure on a guaranty. In *State Bank of Young Am. v. Fabel,* we explained that "[i]t is undoubtedly the law that a sale of the mortgaged property pays and extinguishes the mortgage debt to the amount of the purchase money." 530 N.W.2d 858, 861 (Minn.App.1995) (quotation omitted), *review denied* (Minn. June 29, 1995). We added:

[W]hereas an obligation of a guarantor is not relieved by the discharge of the mortgagor in bankruptcy or the discharge of the mortgagor under the Minnesota foreclosure statute, there must be a deficiency for which the guarantors can be held liable. In cases where a principal debtor is discharged, guarantors of the debt are nonetheless liable for any deficiency; however, in a case in which the underlying debt is fully recovered, there remains nothing for which the guarantors can be held liable.

*Id.* at 863.

Prior Minnesota case law illustrates that when a mortgagee forecloses, the guarantor is responsible for the amount due and owing after applying the proceeds from a foreclosure sale to the debt. *See, e.g., Merchs. State Bank v. Sunset Orchard Land Co.,* 158 Minn. 108, 109–10, 196 N.W. 963, 963–64 (1924); *Maxwell v. Capehart,* 62 Minn. 377, 378–79, 64 N.W. 927, 927–28 (1895); *Nat'l City Bank of Minneapolis v. Lundgren,* 435 N.W.2d 588, 589, 593 (Minn.App.1989), *review denied* (Minn. Mar. 29, 1989); *Twin City Fed. Sav. & Loan Ass'n v. Zimmerman,* 411 N.W.2d 294, 295, 297 (Minn.App.1987).

We also find support in caselaw from other jurisdictions. *See, e.g., 31800 Wick Rd. Holdings, LLC v. Future Lodging–Airport, Inc.,* 848 F.Supp.2d 757, 764–65 (E.D.Mich.2012) (determining that creditor could proceed against guarantor without first collecting from borrower, but declining to determine guarantor's liability until after foreclosure sale because creditor chose to foreclose first); *Alerus Fin., N.A. v. Marcil Grp. Inc.,* 806 N.W.2d 160, 169 (N.D.2011) (holding that creditor could proceed against guarantors without first foreclosing, but noting that "a bid accepted for the foreclosed property at the sheriff's sale in this case would reduce the outstanding liability of the guarantors by the amount of the bid").

Appellant claimed at oral argument that the loan documents follow the statutory framework for applying foreclosure sale proceeds. Appellant asserted that after applying the proceeds from the sale a deficiency, rather than debt, remains. As such, appellant claims that respondents remain liable for the ten percent of the foreclosure judgment, not the deficiency. We are not persuaded. A deficiency is a debt—the amount that remains if the proceeds from a foreclosure sale do not fully satisfy the adjudicated judgment. *See* Minn.Stat. § 581.09 (2012) (requiring entry of satisfaction of the foreclosure judgment to the extent of the bid for the premises less expenses and costs); *Black's Law Dictionary* 487 (9th ed.2009) (defining "deficiency" as "[t]he amount still owed when the property secured by a mortgage is sold at a foreclosure sale for less than the outstanding debt; esp., the shortfall between the proceeds from a foreclosure sale and an amount consisting of the principal debt plus interest plus the foreclosure costs").

Moreover, the statutes support respondents' interpretation of "debt." Minnesota Statutes section 581.03 (2012) states, "Judgment shall be entered, under the direction of the court, adjudging the amount due, with costs and disbursements, and the sale of the mortgaged premises, or some part thereof, to satisfy such amount...." Section 581.09 states, "Upon confirmation of the report of sale, the court administrator shall enter satisfaction of the judgment to the extent of the sum bid for the premises, less expenses and costs. The amount entered is *full satisfaction of the judgment* unless a deficiency is allowed...." (Emphasis added.) The foreclosure statutes provide that the judgment is satisfied by the proceeds from the foreclosure sale, less expenses and costs. The mortgage documents, here, indicate the same: "First: To the payment of the third-party costs and expenses reasonably incurred in connection with any such sale ...; Second: To the payment of the whole amount then due, owing, and unpaid upon the Note for principal and interest." After applying these proceeds, then, the debt has been fully satisfied to the extent of the amount of the foreclosure proceeds (less expenses and costs).

Appellant claims that foreclosure proceeds apply to payment on the debt, but the loan documents do not provide that the foreclosure proceeds redetermine or readjudicate the debt. The debt, appellant asserts, was adjudicated in the foreclosure judgment. But appellant does not explain why the net foreclosure proceeds as applied to payment on the debt would not decrease the debt for purposes of calculating liability under the guaranty. And appellant does not point to a place in the loan documents that states that the meaning of "debt" is the adjudicated amount in a foreclosure judgment or a constant figure. Instead, the loan documents contemplate that the amount of the "debt" is not static, but may change based on payments by the borrower, calculation of interest, and other

factors, including the application of proceeds from a foreclosure sale.

Appellant contends that it pursued the guaranty during the foreclosure action in order to promote judicial economy. It would be arbitrary, capricious, and prejudicial, appellant asserts, to determine liability based on the deficiency rather than the foreclosure judgment because the district court denied summary judgment, held a trial on the meaning of the consent and assumption agreements, and then interpreted the consent and assumption agreements based on the plain language rather than referencing the evidence and testimony elicited at trial. But appellant is in control of this action. And several provisions in the loan documents expressly allow appellant to enforce the guaranty at any time in the event of a default.

In sum, the term "debt" is unambiguous. The loan documents require foreclosure proceeds to be applied to the debt. And "debt" is not a constant figure, but a fluctuating one. Appellant could have either collected on the guaranty prior to instituting foreclosure proceedings or delayed the foreclosure sale in order to first collect on the guaranty. Appellant chose not to.[3] Appellant's predecessor could have clarified in the consent and assumption agreements that the guaranty is "10% of the Debt as it exists prior to foreclosure," "10% of the foreclosure judgment," or "10% of the Debt without regard to foreclosure proceeds." It could have excluded the provisions in the mortgages that outline disbursement of foreclosure proceeds. But appellant's predecessor did not. We are left to interpret the guaranty in conjunction with the loan documents, which clearly indicate that the parties intended to provide additional security to the lender

and that the proceeds from a foreclosure sale would be deducted from the amounts due and owing under the notes.

## DECISION

Because the loan documents require that foreclosure proceeds apply to the debt, the district court did not err in its interpretation of the guaranty within the consent and assumption agreements to mean that respondents are liable for ten percent of the debt remaining after applying the proceeds from the foreclosure sales to the foreclosure judgments.

**Affirmed.**

---

**3.** We note that on the facts of this case, a double-recovery is not at issue and we do not address this possibility.